DEPARTMENT OF TRANSPORTATION v. M.M. FOWLER, INC.

No. 305PA05

(Filed 15 December 2006)

**Eminent Domain— fair market value—lost business profits**

The trial court erred by allowing quantified lost business profits testimony in a condemnation action, and an appraisal based on that evidence, for determining the fair market value of the land on which a business is located, and the case is reversed and remanded, because: (1) when evidence of income is used to valuate property, care must be taken to distinguish between income from the property and income from the business conducted on the property; (2) the longstanding rule in North Carolina is that evidence of lost business profits is inadmissible in condemnation actions, and this rule comports with the federal rule; (3) when government takes property, the damages are confined to the diminished pecuniary value of the property incident to the wrong; (4) just compensation is not the value to the owner for his particular purposes since awarding damages for lost profits would provide excess compensation for a successful business owner while a less prosperous one or an individual landowner without a business would receive less money for the same taking; (5) if business revenues were considered in determining land values, an owner whose business is losing money could receive less than the land is worth; (6) limiting damages to the fair market value of the land prevents unequal treatment based upon the use of the real estate at the time of condemnation; (7) paying business owners for lost business profits in a partial taking results in

1

DEPARTMENT OF TRANSP. v. M.M. FOWLER, INC.

[361 N.C. 1 (2006)]

inequitable treatment of the business owner whose entire property is taken; (8) the speculative nature of profits makes them improper bases for condemnation awards, and the uncertain character of lost business profits evidence could burden taxpayers with inflated jury awards bearing little relationship to the condemned land's fair market value; (9) any determination of fair market value must be based on the diminution in value, not just for the current owner of the property, but for any owner who would put the property to its highest and best use; (10) there is no difference between using lost profits to determine the fair market value of the land and awarding them as a separate item of damages when by either improper calculation, the business receives compensation for its lost profits; (11) allowing the jury to consider that the land may be less valuable due to the condemnation's effect on the landowner's business does not require that quantified evidence of lost profits also be admitted; and (12) a limiting instruction is insufficient to overcome the error resulting from introduction of quantified evidence of lost business profits.

Justice MARTIN dissenting.

Justices WAINWRIGHT and TIMMONS-GOODSON join in this dissenting opinion.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 170 N.C. App. 162, 611 S.E.2d 448 (2005), affirming a judgment entered on 8 October 2003 by Judge Robert H. Hobgood in Superior Court, Durham County. Heard in the Supreme Court 13 February 2006.

*Roy Cooper, Attorney General, by Richard A. Graham and James M. Stanley, Jr., Assistant Attorneys General, and W. Richard Moore and E. Burke Haywood, Special Deputy Attorneys General, for plaintiff-appellant.*

*Hutson Hughes & Powell, P.A., by James H. Hughes, for defendant-appellee.*

NEWBY, Justice.

The issue is whether, in a condemnation action, the jury may consider quantified lost business profits in determining the fair market value of the land on which the business is located. Applying our well-

established case law, we hold it may not, and accordingly, we reverse the Court of Appeals and order a new trial.

## I. BACKGROUND

To safely accommodate increased traffic and promote public safety, the North Carolina Department of Transportation ("DOT") proposed improvements at the intersection of Garrett Road and Durham-Chapel Hill Road in Durham County. When DOT and landowner M.M. Fowler, Inc. ("MMFI") were unable to agree on a purchase price, DOT filed an eminent domain action to condemn a portion of MMFI's land for the construction project. MMFI's property, originally 47,933 square feet, contains a gasoline station and convenience store, which MMFI pays an independent contractor to operate. The DOT improvement project necessitated a 13,039-square-foot right-of-way as well as a 1,664-square-foot slope easement and a 6,166-square-foot temporary construction easement. After the permanent taking, the remaining property totaled 34,894 square feet.

In its complaint, DOT requested a determination of just compensation for the taking in accordance with Article 9 of Chapter 136 of the General Statutes. Concurrently, DOT deposited $166,850 with the Durham County Superior Court as its estimate of just compensation. MMFI answered and demanded a jury trial.

Prior to trial, DOT filed a motion *in limine* asking the court to exclude, *inter alia*, "[e]vidence concerning loss of profits or income, loss of business, loss of goodwill, or interruption of business." The trial court initially allowed the motion "until [it] should rule otherwise." At trial, the court heard arguments from both parties on the issues and ultimately denied DOT's motion *in limine*. However, the trial court gave the following limiting instruction purportedly derived from *Kirkman v. State Highway Commission*, 257 N.C. 428, 432, 126 S.E.2d 107, 110 (1962):

"[L]oss of profits or injury to a growing business conducted on property or connected therewith are not elements of recoverable damages in an award for the taking under the power of eminent domain. However, when the taking renders the remaining land unfit or less valuable for any use to which it is adapted, that factor is a proper item to be considered in determining whether the taking has diminished the value of the land itself."

MMFI's witnesses estimated the loss in value caused by the taking to be between $500,000 and $540,000. These estimates were based

solely on capitalization of the company's alleged lost business profits. DOT's evidence indicated MMFI was entitled to approximately $169,000 to $225,700. The jury returned a verdict awarding $375,000 as damages for the permanent taking and $75,000 for the temporary construction and slope easements. On 8 October 2003, the trial court entered a judgment awarding MMFI a total of $450,000 plus interest from the date of the complaint until the date of judgment.

DOT appealed the jury's verdict on the permanent taking, arguing the trial court improperly admitted lost profits evidence. The Court of Appeals affirmed the trial court, holding that, although our case law generally forbids evidence of lost profits, *Kirkman* creates a limited exception in a partial taking when access to the remaining property is restricted or denied. *DOT v. M.M. Fowler, Inc.*, 170 N.C. App. 162, 165-66, 611 S.E.2d 448, 450-51 (2005). We allowed DOT's petition for discretionary review to determine whether the Court of Appeals erred in affirming the trial court's admission of lost profits evidence.

## II. CONDEMNATION PROCEEDINGS

Our Court has stated:

> The right to take private property for public use, the power of eminent domain, is one of the prerogatives of a sovereign state. The right is inherent in sovereignty; it is not conferred by constitutions. Its exercise, however, is limited by the constitutional requirements of due process and payment of just compensation for property condemned.

*State v. Core Banks Club Props., Inc.*, 275 N.C. 328, 334, 167 S.E.2d 385, 388 (1969) (citing *Redevelopment Comm'n v. Hagins*, 258 N.C. 220, 128 S.E.2d 391 (1962)). Both the state and federal constitutions limit the State's power of eminent domain. North Carolina's Constitution protects the rights of property owners through the "Law of the Land Clause," which provides that "[n]o person shall be . . . deprived of his . . . property, but by the law of the land." N.C. Const. art. I, § 19; *see also McKinney v. Deneen*, 231 N.C. 540, 542, 58 S.E.2d 107, 109 (1950) (citing N.C. Const. of 1868, art. I, § 17, the predecessor of the current N.C. Const. art. I, § 19). In other words, although the State can condemn land for public use, the owner must be justly compensated. As Professor John V. Orth has noted: " 'Notwithstanding there is no clause in the Constitution of North Carolina which expressly prohibits private property from being taken for public use without compensation . . ., yet the principle is so

grounded in natural equity that it has never been denied to be a part of the law of North Carolina.' " John V. Orth, *The North Carolina State Constitution* 58 (Univ. of N.C. Press 1995) (1993) (quoting *Johnston v. Rankin*, 70 N.C. 441, 442, 70 N.C. 550, 555 (1874) (alterations in original)). Similarly, the Federal Constitution guards the due process rights of property owners through the Fourteenth Amendment. U.S. Const. amend. XIV, § 1 ("[N]or shall any State . . . deprive any person of life, liberty, or property, without due process of law . . . ."); *see also Sale v. State Highway & Pub. Works Comm'n*, 242 N.C. 612, 617, 89 S.E.2d 290, 295 (1955).

Although the State possesses the power of eminent domain by virtue of its sovereignty, "the right . . . lies dormant . . . until the legislature, by statute, confers the power and points out the occasion, mode, conditions and agencies for its exercise." *Core Banks*, 275 N.C. at 334, 167 S.E.2d at 389. Chapter 136 of the General Statutes codifies the statutory scheme authorizing condemnation by DOT for our state's system of roadways. Section 136-18 permits DOT to acquire land necessary for highways "by gift, purchase, or otherwise." N.C.G.S. § 136-18(2) (2005). Article 9 sets forth the procedure for acquiring land by condemnation. These proceedings commence when DOT files a complaint and declaration of taking accompanied by a deposit of the estimated just compensation in the superior court in the county where the land is located. *Id.* § 136-103(a) (2005). DOT must include in its complaint, *inter alia*, a prayer for determination of just compensation. *Id.* § 136-103(c) (2005). Upon filing and deposit, title to the land vests in DOT. *Id.* § 136-104 (2005). The right to just compensation vests in the landowner, who may apply to the court for disbursement of the deposit, file an answer requesting a determination of just compensation, or both. *Id.* §§ 136-104, -105, -106 (2005).

The statutes provide that just compensation includes damages for the taking of property rights plus interest on the amount by which the damages exceed DOT's deposit. *Id.* §§ 136-112, -113 (2005). When DOT condemns only part of a tract of land, just compensation consists of the difference between the fair market value of the entire tract immediately before the taking ("before value") and the fair market value of the land remaining immediately after the taking ("after value"). *Id.* § 136-112(1).

Although Chapter 136 offers no guidance on the calculation of fair market value, this Court has recognized:

[T]he well established rule is that in determining fair market value the essential inquiry is, "what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted—that is to say, what is it worth from its availability for all valuable uses?"

*State v. Johnson*, 282 N.C. 1, 14, 191 S.E.2d 641, 651 (1972) (quoting *Barnes v. Highway Comm'n*, 250 N.C. 378, 387, 109 S.E.2d 219, 227 (1959) (alteration in original)); *see also Black's Law Dictionary* 1587 (8th ed. 2004) (defining "fair market value" as "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction"). In most instances, landowners seek to prove fair market value through the testimony of the owners themselves and that of appraisers offered as expert witnesses. *See, e.g., N.C. State Highway Comm'n v. Helderman*, 285 N.C. 645, 207 S.E.2d 720 (1974). An opinion concerning property's fair market value must not rely in material degree on factors that cannot legally be considered. *Id.* at 655-56, 207 S.E.2d at 727. Likewise, regardless of professional qualifications, an expert's opinion must be reasonably reliable. *DOT v. Haywood Cty.*, 360 N.C. 349, 352, 626 S.E.2d 645, 647 (2006) (holding the trial court properly excluded the testimony of three "experienced" expert appraisers because "the testimony lacked sufficient reliability"). To resolve this case, we must decide whether MMFI's witnesses improperly based their opinions on alleged lost business profits and if so, whether the trial court erred in permitting the introduction of such evidence despite its limiting instruction.

## III. ADMISSIBILITY OF LOST BUSINESS PROFITS EVIDENCE

### A. The *Pemberton* Framework

During a proceeding to determine just compensation in a partial taking, the trial court should admit any relevant evidence that will assist the jury in calculating the fair market value of property and the diminution in value caused by condemnation. *Abernathy v. S. & W. Ry. Co.*, 150 N.C. 80, 89, 150 N.C. 97, 108-09, 63 S.E. 180, 185 (1908). Admission of evidence that does not help the jury calculate the fair market value of the land or diminution in its value may "confuse the minds of the jury, and should be excluded." *Id.* at 89, 150 N.C. at 109, 63 S.E. at 185. In particular, specific evidence of a landowner's noncompensable losses following condemnation is inadmissible. *Templeton v. State Highway Comm'n*, 254 N.C. 337, 339-40, 118 S.E.2d 918, 920-21 (1961) (finding trial court erred in admitting evi-

dence of the cost of silt and mud removal because "it [was] possible that the jury could have gotten the impression that the removal . . . was compensable as a separate item of damage").

Injury to a business, including lost profits, is one such noncompensable loss. It is important to note that revenue derived directly from the condemned property itself, such as rental income, is distinct from profits of a business located on the property. *Compare* 5 Julius L. Sackman et al., *Nichols on Eminent Domain* § 19.02-.05 (rev. 3d ed. 2006) [hereinafter 5 *Nichols*] (discussing rental income and the capitalization thereof as a permissible appraisal method for determining the fair market value of condemned land), *with id.* § 19-06 (devoting a separate section of the treatise to "Income from a Business" and articulating the general rule that "the amount of profit earned from a business conducted on the condemned property is ordinarily not admissible in evidence"); *see also id.* § 19.02, at 19-11 ("While rents are within the broad category of business profits, they are not subject to the general rule denying admission of business profits as evidence on the issue of property value."). This case is concerned with lost business profits. When evidence of income is used to valuate property, "care must be taken to distinguish between income from the property and income from the business conducted on the property." 4 Julius L. Sackman et al., *Nichols on Eminent Domain* § 12B.09, 12B-56 to -59 (rev. 3d ed. 2006) [hereinafter 4 *Nichols*]. The dissent fails to make this distinction throughout its discussion of the law and analysis of the case *sub judice*.

The longstanding rule in North Carolina is that evidence of lost business profits is inadmissible in condemnation actions, as this Court articulated in *Pemberton v. City of Greensboro*, 208 N.C. 466, 470-72, 181 S.E. 258, 260-61 (1935). In *Pemberton*, the plaintiffs brought an action seeking damages for wrongful appropriation of land containing their dairy farm. *Id.* at 467, 181 S.E. at 258. Overflow and runoff from the city's newly constructed sewage treatment plant infected the plaintiffs' cows with anthrax, destroying their entire dairy business. *Id.* At trial, the plaintiffs introduced evidence of milk production and approximate monthly earnings before the incident. 208 N.C. at 468, 181 S.E. at 259.

The trial court overruled the city's objections to this testimony but did give multiple limiting instructions. *Id.* at 467-69, 181 S.E. at 258-59. In particular, the trial court told the jury not to consider the plaintiffs' evidence " 'as any measure of damages' " and specified that the testimony was allowed only for the jury to have the " 'entire situ-

ation' " before it. *Id.* at 468, 181 S.E. at 259. In the jury charge, the trial court instructed that " 'evidence tending to show the earnings and production of plaintiffs' dairying proposition . . . is not admissible as tending to show the measure of damages, but to aid . . . in estimating the extent of the injury sustained.' "[1] *Id.* Despite the trial court's admonitions, our Court concluded it was "manifest from the court's rulings and the jury's verdict that plaintiffs [were] awarded compensation for the loss of their dairy business." 208 N.C. at 470, 181 S.E. at 260. Thus, the city was entitled to a new trial. *Id.* at 472, 181 S.E. at 261.

In holding the limiting instructions were insufficient, this Court specifically noted the trial court's efforts to place the " 'entire situation' " before the jury were "at variance with the rule for the []measurement of damages in compensation cases." *Id.* at 470, 181 S.E. at 260 (citing *Gray v. City of High Point*, 203 N.C. 756, 166 S.E. 911 (1932)). Leading up to *Pemberton*, our Court had consistently stated that when government takes property, "the damages are confined to the diminished pecuniary value *of the property* incident to the wrong." *Moser v. City of Burlington*, 162 N.C. 116, 118, 162 N.C. 141, 144, 78 S.E. 74, 75 (1913) (emphasis added) (citing *Metz v. City of Asheville*, 150 N.C. 613, 150 N.C. 748, 64 S.E. 881 (1909)); *see Gray v. City of High Point*, 203 N.C. 756, 764, 166 S.E. 911, 915 (1932); *Cook v. Town of Mebane*, 191 N.C. 1, 11, 131 S.E. 407, 412 (1926); *Metz v. City of Asheville*, 150 N.C. 613, 615-16, 150 N.C. 748, 751, 64 S.E. 881, 882 (1909); *Williams v. Town of Greenville*, 130 N.C. 65, 68, 130 N.C. 93, 97, 40 S.E. 977, 978 (1902).

In *Pemberton*, this Court adopted the reasoning behind the rule prohibiting lost business profits evidence articulated by U.S. Supreme Court Justice Oliver Wendell Holmes when he served on the Supreme Judicial Court of Massachusetts:

"It generally has been assumed, we think, that injury to a business is not an appropriation of property which must be paid for. There are many serious pecuniary injuries which may be inflicted without compensation. It would be impracticable to forbid all laws which might result in such damage, unless they provided a *quid pro quo*. No doubt a business may be property in a broad sense of the word, and property of great value. It may be assumed for the purposes of this case that there might be such a taking of it as required compensation. But a business is less tangible in

---

1. This jury charge, found erroneous by our Court in *Pemberton*, is essentially the theory of the dissent.

nature and more uncertain in its vicissitudes than the rights which the Constitution undertakes absolutely to protect. It seems to us, in like manner, that the diminution of its value is a vaguer injury than the taking or appropriation with which the Constitution deals. A business might be destroyed by the construction of a more popular street into which travel was diverted, as well as by competition, but there would be as little claim in the one case as in the other."

*Pemberton*, 208 N.C. at 470, 181 S.E. at 260 (quoting *Sawyer v. Commonwealth*, 182 Mass. 245, 247, 65 N.E. 52, 53 (1902)). Justice Holmes's words underscore why excluding damages for lost business profits is sound policy. Constitutional mandates require that the government pay *just* compensation. *Sale*, 242 N.C. at 617, 89 S.E.2d at 295. They do not require expenditure of taxpayer funds for losses remote from governmental action or too speculative to calculate with certainty. *See Pemberton*, 208 N.C. at 471, 181 S.E. at 260-61.

Just compensation " 'is not the value to the owner for his particular purposes.' " *Williams v. State Highway Comm'n*, 252 N.C. 141, 146, 113 S.E.2d 263, 267 (1960) (quoting *United States v. Petty Motor Co.*, 327 U.S. 372, 377, 66 S. Ct. 596, 599, 90 L. Ed. 729, 734 (1946)). Awarding damages for lost profits would provide excess compensation for a successful business owner while a less prosperous one or an individual landowner without a business would receive less money for the same taking. Indeed, if business revenues were considered in determining land values, an owner whose business is losing money could receive less than the land is worth. Limiting damages to the fair market value of the land prevents unequal treatment based upon the use of the real estate at the time of condemnation. Further, paying business owners for lost business profits in a partial taking results in inequitable treatment of the business owner whose entire property is taken, in which case lost profits clearly are not considered. *See Williams*, 252 N.C. at 148, 113 S.E.2d at 269.

Evidence of lost business profits is impermissible because recovery of the same is not allowed. 5 *Nichols* § 19.06[1], at 19-36. Additionally, the speculative nature of profits makes them improper bases for condemnation awards as they

depend on too many contingencies to be accepted as evidence of the usable value of the property upon which the business is carried on. Profits depend upon the times, the amount of capital invested, the social, religious and financial position in the com-

munity of the one carrying it on, and many other elements which might be suggested. What one man might do at a profit, another might only do at a loss. Further, even if the owner has made profits from the business in the past it does not necessarily follow that these profits will continue in the future.

*Id.* § 19.06[1], at 19-37 to -38 (footnotes omitted). Recognizing that profits can rarely be traced to a single factor, business executives rely on complex models to determine profitability. *See, e.g.,* Michael E. Porter, *How Competitive Forces Shape Strategy,* 57 Harv. Bus. Rev. 137 (1979) (detailing Porter's widely accepted "five forces model" that asserts profitability is affected by five factors, each of which includes myriad subfactors). Further, the uncertain character of lost business profits evidence could burden taxpayers with inflated jury awards bearing little relationship to the condemned land's fair market value.

Moreover, our well-established North Carolina rule prohibiting lost business profits evidence comports with the federal rule. *See United States v. Petty Motor Co.,* 327 U.S. 372, 377-78, 66 S. Ct. 596, 599, 90 L. Ed. 729, 734-35 (1946) ("Since 'market value' does not fluctuate with the needs of condemnor or condemnee but with general demand for the property, evidence of loss of profits, damage to good will, the expense of relocation and other such consequential losses are refused in federal condemnation proceedings."); *see also Mitchell v. United States,* 267 U.S. 341, 344-45, 45 S. Ct. 293, 294, 69 L. Ed. 644, 648 (1925); *Joslin Mfg. Co. v. City of Providence,* 262 U.S. 668, 675, 43 S. Ct. 684, 688, 67 L. Ed. 1167, 1174 (1923).

Notwithstanding the dissent's contention to the contrary, this Court's rule also accords with the holdings of the majority of states applying the common law in condemnation proceedings. *See* 4 *Nichols* § 12B.09[1], at 12B-59 ("It is . . . well settled that evidence of the profits of a business conducted upon land taken for the public use is not admissible in proceedings for the determination of the compensation which the owner of the land shall receive.").

In summary, the prevailing rule excluding lost business profits evidence in condemnation actions is firmly rooted in our jurisprudence.[2] As a case that comprehensively discussed and applied this

---

2. The Court of Appeals opinions that the dissent cites in opposition to our holding are in fact consistent with the rule we uphold today. These cases, like our opinion, distinguish between valuations based on income from the business and income from the land itself, such as rental income. *See City of Fayetteville v. M.M. Fowler, Inc.,* 122

enduring rule, *Pemberton* provides the framework upon which we base our decision today.[3]

## B. Application of *Pemberton*

In the present case, the only issue for the jury was the amount of damages DOT owed MMFI. To establish its estimate of fair market value, MMFI offered the testimony of two witnesses: (1) Marvin Barnes, MMFI's president, who detailed the business's lost profits; and (2) Frank Ward, the company's real estate appraiser, who used MMFI's lost business profits to develop a valuation of the land. Both witnesses stated the highest and best use of the property in question was and is its present use as a convenience store and gasoline station both before and after the taking. Mr. Barnes opined that DOT's condemnation impaired the remaining property and made it less valuable for these purposes. MMFI's evidence showed that DOT relocated one of the driveways providing access to its property from Garrett Road

---

N.C. App. 478, 479-80, 470 S.E.2d 343, 345 (allowing valuation based on "impact of the [partial] taking on the rental income generated by the property"), *disc. rev. denied*, 344 N.C. 435, 476 S.E.2d 113 (1996); *City of Statesville v. Cloaninger*, 106 N.C. App. 10, 16-17, 415 S.E.2d 111, 115 (allowing appraisal based on income approach without discussion when utilization of other valuation approaches was inadequate and the testimony challenged on appeal was admitted without objection), *appeal dismissed and disc. rev. denied*, 331 N.C. 553, 418 S.E.2d 664 (1992); *Raleigh-Durham Airport Auth. v. King*, 75 N.C. App. 121, 123-24, 330 S.E.2d 618, 619-20 (1985) (allowing valuation based in part on rental revenues); *Raleigh-Durham Airport Auth. v. King*, 75 N.C. App. 57, 62-63, 330 S.E.2d 622, 625-26 (1985) (allowing valuation based in part on hypothetical rental income derived from rental rates charged for other property in the same area). Furthermore, the dissent ignores the Court of Appeals decisions in *Department of Transportation v. Fleming*, 112 N.C. App. 580, 436 S.E.2d 407 (1993) and *Department of Transportation v. Byrum*, 82 N.C. App. 96, 345 S.E.2d 416 (1986), both of which faithfully apply the prevailing rule. *See Fleming*, 112 N.C. App. at 583, 436 S.E.2d at 410 (excluding appraisal based on income from landowners' plumbing and heating business "and not from any rental value attributable to the land"); *Byrum*, 82 N.C. App. at 99, 345 S.E.2d at 418 (excluding lost business profits evidence and noting the landowner "could have offered evidence of the rents received" but did not).

3. The General Assembly is empowered to change this well-established rule and indeed, as of the time of the issuance of this opinion, is studying the issue. The House Select Committee on Eminent Domain Powers was created on 8 December 2005 to study "issues related to the use of the power of eminent domain." N.C. H. Select Comm. on Eminent Domain Powers, *Interim Report to the 2006 Regular Session of the 2005 General Assembly of North Carolina* 9 (2006). In its interim report the Committee indicated it planned to consider "[p]ayment of damages to persons who operate businesses on condemned property that is affected by a condemnation action" when it resumed its work. *Id.* Of course, we cannot know if any legislation will be enacted. Our duty, however, is not to change the law but to apply it as it currently exists. *See Smith v. Norfolk & S. R.R. Co.*, 114 N.C. 445, 464, 114 N.C. 729, 757, 19 S.E. 863, 871 (1894) ("If such a revolutionary change is to be made in the law . . . , it should be done by the Legislature and not by the Court. *Jus dicere non dare.*").

to Durham-Chapel Hill Road. The other two driveways were left in essentially the same location, although one was shorter and steeper after completion of the roadway project.[4]

Following the trial court's limiting instruction, Mr. Barnes testified that MMFI lowered the price of gasoline, and consequently, the profit margin on each gallon sold dropped four cents in the five months following completion of construction. He believed the price reduction was necessary because of decreased customer access to the property resulting from DOT's alterations of the driveways. Mr. Barnes multiplied MMFI's alleged profit decrease by the number of gallons of gasoline sold each year at the station and arrived at a figure of $90,000 as the lost profits MMFI would suffer in the year following the taking. Mr. Barnes then assigned a before value of $1.3 million to the property and an after value of $800,000. He calculated the after value using what he considered to be a "conservative factor" of six times his estimate of yearly lost profits, which resulted in a $540,000 reduction in value.

Although the trial court properly admitted Mr. Barnes's testimony that DOT's condemnation made it more difficult for customers to enter MMFI's service station, it should have excluded the quantified estimate of lost profits and any valuation based solely on this evidence. One factor in determining the value of condemned property is the highest and best use of the land. *Kirkman*, 257 N.C. at 432, 126 S.E.2d at 111. If the condemnation renders the remaining property "unfit or less valuable" for its highest and best use or any use to which it is adapted, the jury may consider the injury to the remaining land in its assessment of fair market value. *Id.* at 432, 126 S.E.2d at 110. Further, a landowner may express an opinion as to the fair market value of the property for the jury to weigh because "it is generally understood that the opinion of the owner is so far affected by bias that it amounts to little more than a definite statement of the maximum figure of his contention." *Helderman*, 285 N.C. at 652, 207 S.E.2d at 725 (citation and internal quotations omitted). However, a landowner may not supplement this opinion with detailed evidence of lost business profits. *Williams*, 252 N.C. at 147-48, 113 S.E.2d at 268. Doing so suggests to the jury that the property owner is entitled to those losses. *See Templeton*, 254 N.C. at 340, 118 S.E.2d at 921 (finding error in trial court's admission of evidence of "loss of rev-

---

4. The Court of Appeals erroneously stated that DOT reduced the number of entrances to the property from two to one. DOT changed the location of one entrance but did not reduce the total of three driveways serving the property.

enue from fishing as a separate item of damage without taking into account what [e]ffect, if any, this had on the fair market value of the land after the taking").

Any determination of fair market value must be based on the diminution in value—not just for the current owner of the property, but for any owner who would put the property to its highest and best use. In this case, MMFI attempted to recover for harm to its business rather than damage to the land itself.

Like Mr. Barnes's testimony, Mr. Ward's appraisal testimony was improperly admitted to the extent it was based on lost business profits. Mr. Ward testified he used the capitalization of income approach to assess the value of MMFI's land. Although not the preferable method of valuation, applying the income approach was permissible in this case.[5] This appraisal method relies on "actual or projected [income, such as rental income,] . . . earned from the property itself or comparable property." 5 *Nichols* § 19.01, at 19-1; *see id.* § 19.02, at 19-11. However, with the income approach, the appraisal must differentiate between income directly from the property and profits of the business located on the land. 4 *Nichols* § 12B.09, at 12B-56 to -59.

Here, the commercial nature of the property lent itself to appraisals based on comparable rental values even though MMFI did not receive rent from the property. Mr. Ward used his estimate of the rental value of the site in his appraisal of the before value. However, Mr. Ward computed the after value of the real estate by multiplying MMFI's estimate of its lost profits by factors of five and six, averaging the two results, and then subtracting the average from a before value of $1.2 million. Because he based his estimate of the after value solely on MMFI's alleged lost profits, it was improper to allow Mr. Ward's testimony concerning diminution in value.

### C. Application of *Kirkman*

We disagree with the Court of Appeals analysis of *Kirkman* in this case. *Kirkman* simply applied our holding in *Pemberton* to its facts and did not, as the Court of Appeals held, create an exception to *Pemberton* allowing admission of specific lost business profits when partial takings result in restricted access to the land. In

---

5. Methods of appraisal acceptable in determining fair market value include: (1) comparable sales, (2) capitalization of income, and (3) cost. *See* 5 *Nichols* § 19.01, at 19-2. While the comparable sales method is the preferred approach, the next best method is capitalization of income when no comparable sales data are available. 4 *Nichols* § 12B.08, at 12B-47 to -48.

*Kirkman*, the State Highway Commission took a portion of the landowners' property containing a motel and restaurant, eliminating direct access to the land from the highway. 257 N.C. at 430, 126 S.E.2d at 109. The landowners' expert witness testified he had considered the loss in value of the site as used for a motel and restaurant in assessing the fair market value after the taking. *Id.* at 431-32, 126 S.E.2d at 110. Although he took into account that restricting access to the property resulted in a loss of business, the expert did not "[attempt] to measure the loss of business in percentage or in money." *Id.* at 432, 126 S.E.2d at 110. Rather than looking at the particular losses of the business located on the property, the expert broadly considered the way in which eliminating access to the site made it less valuable for anyone who wished to use it to operate a motel and restaurant. *Id.* The dissent wrongly asserts, "*Kirkman* instructs that using lost revenue evidence to inform market value is distinct from recovering lost revenue itself." *Kirkman* clearly does not permit quantified evidence of lost business profits. There is no difference between using lost profits to determine the fair market value of the land and awarding them as a separate item of damages. By either improper calculation, the business receives compensation for its lost profits.

Thus, in *Kirkman*, we did not approve the use of quantified evidence of lost profits. To the contrary, this Court held unquantified lost business profits are a fact that can be *generally* considered in determining whether there has been a diminution in value in the land that remains after a partial taking. *Id.* Our decision in *Kirkman* must be read with our other cases, which clarify that although the jury may consider adverse effects resulting from condemnation that decrease the value of the remaining property, these effects "are not separate items of damage, recoverable as such, but are relevant only as circumstances tending to show a diminution in the over-all fair market value of the property." *Gallimore v. State Highway & Pub. Works Comm'n*, 241 N.C. 350, 355, 85 S.E.2d 392, 396 (1955) (citing *Raleigh, Charlotte & S. Ry. Co. v. Mecklenburg Mfg. Co.*, 169 N.C. 204, 169 N.C. 156, 85 S.E. 390 (1915)); *see also Pemberton*, 208 N.C. at 471, 181 S.E. at 261 ("[D]iminished value of [condemned] land . . . constitutes a proper item for inclusion in the award, but a business *per se* is not 'property' . . . requiring compensation for its taking under the power of eminent domain." (citing *State v. Suncrest Lumber Co.*, 199 N.C. 199, 154 S.E. 72 (1930))). Allowing the jury to consider that the land may be less valuable due to the condemnation's effect on the landowner's business does not require quantified evidence of lost

profits also be admitted. This is an important distinction which unifies our analysis in both *Kirkman* and *Pemberton*. Neither opinion sanctions admission of quantified lost profits evidence.

Furthermore, the trial court's limiting instruction, based on a misreading of *Kirkman*, did not cure the incorrect admission of lost profits testimony and appraisal testimony based on this evidence. Our Court has expressly held a limiting instruction is insufficient to overcome the error resulting from introduction of quantified evidence of lost business profits. *Pemberton*, 208 N.C. at 470, 472, 181 S.E. at 260, 261. Like *Pemberton*, in this case, "[i]t is manifest from . . . the jury's verdict" that MMFI has been awarded compensation for its alleged loss in business profits. *Id.* at 470, 181 S.E. at 260. Thus, the trial court's use of a limiting instruction failed to remedy the admission of such evidence.

## IV. DISPOSITION

Because the trial court erroneously allowed quantified lost business profits testimony and an appraisal based on that evidence, we reverse the Court of Appeals and remand to that court with instructions to further remand this case to the trial court for a new trial.

REVERSED AND REMANDED; NEW TRIAL.

Justice MARTIN dissenting.

"[W]hen the taking renders the remaining land . . . less valuable for any use to which it is adapted, that fact is a proper item to be considered in determining whether the taking has diminished the value of the land itself." *Kirkman v. State Highway Comm'n*, 257 N.C. 428, 432, 126 S.E.2d 107, 110 (1962). Specifically, "[t]he amount of fuel sold at a service station is . . . significant to a buyer and a seller of the property in setting a purchase price." 5 Julius L. Sackman et al., *Nichols on Eminent Domain* § 19.06[2] at 19-44 (rev. 3d ed. 2006). Here, evidence was admitted tending to show that the taking rendered defendant's remaining land less valuable for use as a gasoline station. Accordingly, such evidence was a proper item to be considered by the jury in determining whether the taking has diminished the value of the remaining property. *Id.* § 19.01[1] at 19-5 to 19-6.

I agree with the learned and experienced Superior Court Judge, Robert H. Hobgood, who admitted the *Kirkman* evidence, and our Court of Appeals, which unanimously affirmed Judge Hobgood's

admission of this evidence. The majority opinion differs, overruling *sub silentio* our decision in *Kirkman*, 257 N.C. 428, 126 S.E.2d 107.

In eminent domain proceedings under North Carolina law, " '[a]ny evidence which aids the jury in fixing a fair market value of the land and its diminution by the burden put upon it is relevant and should be heard.' " *Templeton v. State Highway Commission*, 254 N.C. 337, 339, 118 S.E.2d 918, 920 (1961) (quoting *Gallimore v. State Highway & Pub. Works Comm'n*, 241 N.C. 350, 354, 85 S.E.2d 392, 396 (1955) (internal quotation marks omitted)). In the instant case, defendant had the right to present relevant valuation evidence to the jury under this Court's decision in *Kirkman*. Because the majority opinion disregards well settled rules of law in overturning the jury's assessment of fair market value, I respectfully dissent.

The majority opinion essentially characterizes the issue in terms of whether lost profits are directly recoverable, as a separate element of damages, in an eminent domain proceeding. That is not the issue before this Court. Rather, the issue is whether the jury may consider, in its determination of fair market value under N.C.G.S. § 136-112, the diminution in value caused by a taking that renders a tract less valuable for the highest and best use to which it is adapted and used.

In excluding the owner's evidence, which showed how the taking by the North Carolina Department of Transportation (DOT) rendered the property less valuable for use as a gasoline station and convenience store, the majority departs from our forty-four year old landmark decision in *Kirkman*. We explained in *Kirkman* that a jury may consider evidence of lost revenue in determining its assessment of fair market value when the property itself contributes in a direct way to the revenue derived from a tract adapted to its highest and best use. 257 N.C. at 432, 126 S.E.2d at 110-11. North Carolina cases since *Kirkman* have consistently followed this rule of law. *See, e.g.,* *City of Fayetteville v. M. M. Fowler, Inc.*, 122 N.C. App. 478, 479-80, 470 S.E.2d 343, 344-45, *disc. rev. denied*, 344 N.C. 435, 476 S.E.2d 113-14 (1996); *City of Statesville v. Cloaninger*, 106 N.C. App. 10, 15-17, 415 S.E.2d 111, 114-16, *appeal dismissed and disc. rev. denied*, 331 N.C. 553, 418 S.E.2d 664 (1992); *Raleigh-Durham Airport Auth. v. King*, 75 N.C. App. 121, 123-25, 330 S.E.2d 618, 619-21 (1985); *Raleigh-Durham Airport Auth. v. King*, 75 N.C. App. 57, 62-64, 330 S.E.2d 622, 625-26 (1985). The majority opinion places North Carolina squarely within a small minority of jurisdictions nationwide that employ a per se ban on the admission of this type of evidence in eminent domain proceedings.

Our General Statutes provide that when DOT's exercise of eminent domain power results in a partial taking of a tract of land, the measure of damages is the difference between the fair market value of the entire tract before the taking and the value of the remainder after the taking. *See* N.C.G.S. § 136-112 (2005). As indicated, "[a]ny evidence which aids the jury in fixing a fair market value of the land and its diminution by the burden put upon it is relevant and should be heard." *Templeton*, 254 N.C. at 339, 118 S.E.2d at 920 (quoting *Gallimore*, 241 N.C. at 354, 85 S.E.2d at 396 (internal quotation marks omitted)). To that end, "[a]ll factors pertinent to a determination of what a buyer, willing to buy but not under compulsion to do so, would pay and what a seller, willing to sell but not under compulsion to do so, would take for the property must be considered." *City of Charlotte v. Charlotte Park & Recreation Comm'n*, 278 N.C. 26, 34, 178 S.E.2d 601, 606 (1971).

The majority's exclusion of evidence showing how the taking rendered the remainder less valuable is fundamentally inconsistent with the statutory requirement that the owner receive fair market value for involuntarily taken property. As Mr. Marvin Barnes, defendant's owner, explained during his testimony, a "willing buyer" would have valued the fair market value of this tract immediately prior to the taking at $1.3 million: "[A]ny person who is knowledgeable about convenience stores and gasoline sales, who knew, in fact, exactly what that store was doing in terms of gallons sold, if he had that information, if there was no store there, he would pay that willingly and in a heartbeat." (t 86) In excluding this evidence, the majority opinion prevents the jury from knowing what a "buyer, willing to buy but not under compulsion to do so, would pay." *City of Charlotte*, 278 N.C. at 34, 178 S.E.2d at 606.

In so doing, the majority's result is fundamentally at odds with the statutory objective of N.C.G.S. § 136-112: To compensate the "unwilling" seller with fair market value. That is, since the income potential of revenue-producing property is the <u>most important characteristic</u> in establishing the value for a voluntary exchange, the majority opinion excludes, as a matter of law, the very information that a willing buyer would want to know about this property. *See* 5 Julius L. Sackman et al., *Nichols on Eminent Domain* § 19.01[1] at 19-6 (rev. 3d ed. 2006) [hereinafter *Nichols*] ("Income derived from the property is recognized as a prime consideration of buyers and sellers in establishing a purchase price, and is therefore admissible as probative of a property's fair market value."). Consequently, despite

the statutory commitment expressed by our General Assembly that owners receive fair market value, we can be assured of one thing on remand of this case: Defendant will not receive fair market value for DOT's involuntary taking of this property.

As the majority recognizes, "injury to a business is not an appropriation of property which must be paid for." *Pemberton v. City of Greensboro*, 208 N.C. 466, 470, 181 S.E. 258, 260 (1935) (quoting *Sawyer v. Commonwealth*, 182 Mass. 245, 247, 65 N.E. 52, 53 (1902)). The Court reaffirmed this rule in *Kirkman*, explaining that "[l]oss of profits or injury to a growing business conducted on property or connected therewith are not elements of recoverable damages in an award for the taking under the power of eminent domain." 257 N.C. at 432, 126 S.E.2d at 110.

But the majority misconstrues *Kirkman's* immediate qualification of this principle: "However, when the taking renders the remaining land unfit <u>or less valuable for any use to which it is adapted</u>, that fact is a proper item to be considered in determining whether the taking has diminished the value of the land itself. If it is found to do so, the diminution is a proper item for inclusion in the award." *Id.* (emphasis added). In the next paragraph, the Court engaged in a more detailed discussion of property use, elaborating: "<u>The highest and most profitable use for which property is adaptable is one of the factors properly considered in arriving at its market value.</u>" 257 N.C. at 432, 126 S.E.2d at 111 (emphasis added) (citing *Williams v. State Highway Comm'n of N.C.*, 252 N.C. 514, 114 S.E.2d 340 (1960)).

*Kirkman* instructs that using lost revenue evidence to inform market value is distinct from recovering lost revenue itself. By analogy, with respect to an aggrieved party's attempt to introduce evidence of lost rents, the Court commented: "When rental property is condemned the owner may not recover for lost rents, but rental value of property is competent upon the question of the fair market value of the property at the time of the taking." 257 N.C. at 432, 126 S.E.2d at 110 (emphasis added) (citing *Palmer v. N.C. State Highway Comm'n*, 195 N.C. 1, 141 S.E. 338 (1928)); *see also Ross v. Perry*, 281 N.C. 570, 575, 189 S.E.2d 226, 229 (1972) ("In determining [a property's] fair market value the rental value, or income, of the property is merely one of the factors to be considered. Income from the property is material only insofar as it throws light upon its market value."). As noted by a leading treatise: "Loss of rents or profits may . . . be admitted to prove diminution in value of remaining

property caused by a taking." *Nichols*, § 19.01[1] at 19-5 to 19-6 (emphasis added).

Despite the critical distinction that *Kirkman* draws between permissible and impermissible use of lost revenue or lost income evidence, the majority opinion misconstrues prior decisions in which landowners in eminent domain proceedings were barred from seeking compensation for lost profits. In *Pemberton*, for example, this Court disallowed the landowners' evidence regarding loss to their dairy business. The Court ruled that the trial judge had improperly instructed the jury to consider such evidence "to estimat[e] the extent of the injury sustained," resulting in an improper award of "compensation for the loss of their dairy business." 208 N.C. at 470, 181 S.E. at 260. Likewise, in *Williams v. State Highway Commission*, the leaseholder alleged that "moving his grocery business to another location cost him business, customers, and good will," and sought to recover therefor. 252 N.C. 141, 145, 113 S.E.2d 263, 267 (1960). The Court found that such damages were noncompensable in condemnation proceedings. *Id.* at 148, 113 S.E.2d at 268-69. In *Williams*, the Court stated: "[L]oss where made up of the profits which might have been made by the business but of which the owner was deprived by reason of the necessary interruption of such business by the condemnor is under the prevailing rule excluded from consideration in determining the damages to which the owner is entitled." *Id.* at 147, 113 S.E.2d at 268. The Court's decisions in *Pemberton* and *Williams* reiterated that evidence of lost profits is not admissible as a direct measure of the "loss . . . made up of the profits," *Williams*, 252 N.C. at 147, 113 S.E.2d at 268, or as an "estimat[e] [of] the injury sustained," *Pemberton*, 208 N.C. at 470, 181 S.E. at 260. These courts, however, did not address the use of lost revenue in appraising a property's market value. As such, they are inapposite to the instant case.

The careful balance struck by this Court in *Kirkman* comports with modern principles of economics in the real estate market. Under the widely accepted income capitalization approach to real estate appraisal, the income derived from a tract of land is relevant to the property's fair market value. *See Nichols* § 19.01[2] at 19-8, § 19.02 at 19-11 to -16; Appraisal Inst., *The Appraisal of Real Estate* 449-68 (11th ed. 1996) [hereinafter *Appraisal*]. Under this approach, land value is appraised by taking the property's projected income stream over several years and capitalizing it by applying a market rate of interest. *See Nichols* § 19.01 at 19-3, 19-8, § 19.02 at 19-11; *Appraisal*

at 462 ("Yield Capitalization"). Alternatively, the property's fair market value may be determined by multiplying its income for a single year by an "income factor." *Appraisal* at 461-62 ("Direct Capitalization").

In valuing location-dependent commercial properties like gas stations, the most effective appraisal technique is often the income capitalization approach. Indeed, at trial in the present case, DOT conceded that the income capitalization approach was "basically the best way to value a property, an income producing property, such as [defendant's property]." (t 57) As this Court has emphasized: "In condemnation proceedings our decisions are to the effect that damages are to be awarded to compensate for loss sustained by the landowner. 'The compensation must be full and complete and include everything which affects the value of the property and in relation to the entire property affected.' " *State Highway Comm'n v. Phillips*, 267 N.C. 369, 374, 148 S.E.2d 282, 286 (1966) (internal citation omitted) (quoting *Abernathy v. S. & W. Ry. Co.*, 150 N.C. 80, 88-89, 150 N.C. 97, 108, 63 S.E. 180, 185 (1908)).

In the present case, the evidence showed that the property upon which the convenience store and gas station was located contributed in a unique way to the revenue derived by the owner based on adaptation of the property to its highest and best use. Witnesses for both DOT and defendant agreed that the highest and best use of the property was as a gas station and convenience store. Mr. Marvin Barnes, defendant's owner, stated that the property in question had been adapted and developed for use as a gas station. Mr. Barnes testified that over the past thirty years he had evaluated and purchased approximately thirty to thirty-five properties for use as gasoline stations or combined gasoline station and convenience stores. Mr. Barnes indicated that convenience is one of the most important factors in determining the value of land used for a gas station. He testified at trial:

Q In evaluating a piece of property for purchase as a gas station site or a convenience store site, what factors do you look at to determine what the value of that site should be?

A Well, we look at all the surrounding demographics, traffic count and influx and whether the site lays well. Whether or not it will be or can be made convenient for people to buy gasoline there.

**DEPARTMENT OF TRANSP. v. M.M. FOWLER, INC.**

[361 N.C. 1 (2006)]

Q And what are the—Do you look at the orientation of the building . . . to the road?

A Well we decide which roads. Generally we build on corner sites and we decide which way we want the store to face, which road it will face. And then we try to work out a configuration that will make the store easy for the public to come in to do business and then leave.

Q And is the orientation of the driveways that go in and out of the site, does that have any impact when you're evaluating the site for value?

A Well, it's one of the most important factors. It's crucial. Gasoline is a commodity. And so people won't go out of their way to purchase it. You've got to make it easy for them.

Q When you are evaluating a piece of property for, or making a determination about a potential value of a piece of property for purchase as a service—gas station or convenience store, do you take into or make any projections as to what you believe the potential sales volume of gasoline that that site might be able to make?

A I do. I have to decide how many units or gallons a particular site can sell on an annual basis.

Mr. Barnes also gave extensive testimony detailing why, as a result of the taking, it was less convenient for customers to access the gas station. Before the taking, the property was served by three driveways that were very convenient for customers. The first driveway, which faced Old Chapel Hill Road and centered on the four gasoline dispensers and the convenience store itself, "allow[ed] people to come in, get gas, [and then] either exit on Garrett Road or return to Old Chapel Hill Road." A second driveway, located on Garrett Road near its intersection with Old Chapel Hill Road, "allowed people coming toward Durham on Old Chapel Hill Road to make a left-hand turn and go directly into the station in front of the [gasoline] dispensers to get gas and then leave by [a third driveway located farther from the intersection] on Garrett Road." Alternatively, customers entering on the second driveway "who wanted to continue on down Old Chapel Hill Road toward South Square and Durham after getting gas again could turn around and go back out to Old Chapel Hill Road" on the first driveway.

**DEPARTMENT OF TRANSP. v. M.M. FOWLER, INC.**

[361 N.C. 1 (2006)]

Everything changed when DOT condemned a substantial portion of defendant's lot. The second pre-taking driveway, located on Garrett Road near its intersection with Old Chapel Hill Road, "was done away with entirely." The other driveway on Garrett Road became "more steep" and less convenient to customers because it was shortened and the resulting grade became more severe. After the taking, the two driveways established by DOT on Old Chapel Hill Road were "not as well positioned." According to Barnes, "As you come up to the store from Durham . . . there is a gradual grade of a crest . . . just on the Durham side of the store. The truth is cars coming there can't see cars coming out of this lower driveway because it's down below them" due to the new grade. Mr. Barnes also stated that the "after taking" driveway layout often forced customers to "make a u-turn to go back out the way they came."

Mr. Barnes testified that this lack of convenience "directly caused" a drop in the margin that this particular property achieved of "four cents" per gallon of gasoline. Based upon this "quantified" data, Mr. Barnes could accurately calculate that gasoline revenues would fall $90,000 in the first full year after completion of the DOT project. Based on the income capitalization approach, which the state conceded was appropriate for income-producing property such as defendant's, Mr. Barnes gave his opinion as to the fair market value of the property before the taking, $1.3 million, and after the taking, $800,000.

Similarly, defendant's expert appraiser, Mr. Frank Ward, testified that the property was worth $1.2 million before the taking and $700,000 after the taking. Mr. Ward stated that "the reduction in income [caused by the taking] had diminished the value of the property." Mr. Barnes and Mr. Ward both testified that they based their "after value" on the loss in revenue directly caused by the impact of the taking on the property itself.

Accordingly, defendant's witnesses gave their opinion as to the before and after value of the property as required by N.C.G.S. § 136-112. They explained the bases of their opinions, which included the "certain" reduction in revenue resulting from DOT's taking.

Twice, Judge Hobgood gave a cautionary instruction, admonishing the jury that it was not to award damages for any loss in business income. The language carefully selected by Judge Hobgood for this instruction was a mirror image of the language of *Kirkman*, far from the "misreading of *Kirkman*" asserted by the majority:

Loss of profits or injury to a growing business conducted on property or connected therewith are not elements of recoverable damages and an award for the taking under the power of eminent domain. However, when the taking renders the remaining land unfit or less valuable for any use to which it is adapted, that fact is a proper item to be consider[ed] in determining whether the taking has diminished the value of the land itself.

Having been properly charged under *Kirkman*, *see* 257 N.C. at 432, 126 S.E.2d at 110, it was the jury's exclusive role to weigh the evidence, assess credibility where the evidence conflicted, and determine damages. *See Williams*, 252 N.C. at 519, 114 S.E.2d at 343. Nothing in the facts of the instant case differentiates it from cases in which we have allowed evidence of lost rents or lost revenue to inform the market value determination. As noted by our Court of Appeals in the instant case, "[t]he holding in *Kirkman* is not limited to instances where rental property is involved, as it was not a case involving rental property." *Dep't of Transp. v. M.M. Fowler, Inc.*, 170 N.C. App. 162, 164, 611 S.E.2d 448, 450 (2005).

Notably, in the instant case, the majority's opinion aligns North Carolina with a minority of states which apply a per se ban on this type of evidence in eminent domain proceedings. As a leading treatise observes, a majority of states follow the rule that "[r]ents and profits derived from the use to which property is applied are generally admissible as evidence which may properly be considered in ascertaining the market value of property taken by eminent domain." *Nichols* § 19.01[1] at 19-4 to -5, and cases cited therein. Moreover, the same treatise notes the federal courts' adherence to this general rule and cites four federal cases—one of which decided by a federal court in North Carolina, *id.* at 19-5 n.11. *See United States v. 179.26 Acres of Land*, 644 F.2d 367, 371-72 (10th Cir. 1981) ("The major factors to be considered in determining the market value of real estate in condemnation proceedings are: . . . (h) the net income from the land, if the property is devoted to one of the uses to which it could be most advantageously and profitably applied." (internal citation and quotation marks omitted)); *Spitzer v. Stichman*, 278 F.2d 402, 410 (2d Cir. 1960) ("In the absence of a market value, [the award] may properly be determined by what the property brings in the way of earnings to its owner." (citation and internal quotation marks omitted)); *United States v. 298.31 Acres of Land*, 413 F.Supp. 571, 573 (S.D. Iowa 1976) ("To determine the value of property by the capitalization of income method, the following is required: the future net income to be

expected from the property is discounted to the present to provide for both a return on the investment and an amortization of the investment." (citation and internal quotation marks omitted)); *United States v. 121.20 Acres of Land*, 333 F.Supp. 21, 32-34 (E.D.N.C. 1971) (utilizing, in part, an income capitalization approach to value condemned land). Thus, the majority's categorical assertion that federal courts unanimously follow its minority approach is simply inaccurate.

Moreover, although not mentioned by the majority, the methodology and evidence relied upon by appraisal witnesses are subject to few limitations under the law of this state. *See Bd. of Transp. v. Jones*, 297 N.C. 436, 438, 255 S.E.2d 185, 187 (1979) (holding that N.C.G.S. § 136-112 does not restrict expert real estate appraisers to "any particular method of determining the fair market value of property"); *State Highway Comm'n v. Conrad*, 263 N.C. 394, 399, 139 S.E.2d 553, 557 (1965) (holding that an expert real estate appraiser may base his opinion on and testify to a broad range of sources, including those not otherwise admissible). Again, "[a]ll factors pertinent to a determination of what a buyer, willing to buy but not under compulsion to do so, would pay and what a seller, willing to sell but not under compulsion to do so, would take for the property must be considered." *City of Charlotte*, 278 N.C. at 34, 178 S.E.2d at 606.

The majority concedes that evidence of lost revenue or lost profits may be considered broadly in determining the fair market value of condemned land, but objects to the admissibility of "quantified" evidence of lost revenue. Specifically, the majority acknowledges that "the trial court properly admitted Mr. Barnes's testimony that DOT's condemnation made it more difficult for customers to enter MMFI's service station," but objects to the introduction of a "quantified estimate" of lost revenue directly caused by DOT's taking.

If the majority is truly concerned about speculative evidence, then it makes little sense to allow *unquantifiable* evidence while excluding quantifiable evidence based on expert appraisal testimony. It was undisputed in this case that the real estate appraiser's qualifications were impeccable: he testified that he had been in the real estate appraising business for forty-two years, had been certified by the state ever since 1990, the first year certification was required, and had regularly appraised property for the State Department of Transportation for three decades. Given the reliability of the real estate appraisal here—which the state never challenged—it is difficult to find the logic or wisdom in a rule that would exclude the

"hard" evidence provided by Mr. Ward, while allowing more speculative "soft" evidence of unquantifiable (and thus, largely unverifiable) losses.

The majority further hypothesizes: "[I]f business revenues were considered in determining land values, an owner whose business is losing money could receive less than the land is worth." This is a red herring. According to *Nichols*:

> If . . . the condemnor . . . seeks to bring out the actual income from the property, it should first be obliged to offer evidence that the use to which the land was actually put was one of the uses to which the land was best adapted . . . . It would, of course, be absurd to admit evidence of the income to be derived from raising potatoes on a valuable city lot, or renting it for a tennis court or for one-story booths, as evidence of the price it would bring as a real estate investment.

*Nichols*, § 19.01 at 19-3.

Perhaps most importantly, the General Assembly has not acted to amend the eminent domain statutes even after repeated decisions from this Court and the Court of Appeals over the course of many years indicating that evidence of lost revenue or lost profits may be used under these facts to inform market value. When, as here, the General Assembly has acquiesced in judicial construction of a statute, we must presume that it approves of the interpretation accorded to the statute by the courts. *See Rowan Cty. Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 9, 418 S.E.2d 648, 654 (1992) ("The legislature's inactivity in the face of the Court's repeated pronouncements [on an issue] can only be interpreted as acquiescence by, and implicit approval from, that body."); *see also State v. Jones*, 358 N.C. 473, 484, 598 S.E.2d 125, 132 (2004) ("We presume, as we must, that the General Assembly had full knowledge of the judiciary's long standing practice. Yet, during the course of multiple clarifying amendments . . . at no time did the General Assembly amend [the relevant] section . . . ."). Thus, the majority opinion not only alters a rule of law that has been in place for nearly half a century, but it also subverts legislative intent. If the General Assembly desired to change our law as the majority does today, it could easily do so. Indeed, as the majority itself points out, the General Assembly is in fact currently studying this issue. *See* N.C. H. Select Comm. on Eminent Domain Powers, *Interim Report to the 2006 Regular Session of the 2005 General Assembly of North Carolina* 9 (2006).

The jury in the present case should be entitled to consider how DOT's taking rendered defendant's property less valuable for use as a gas station and convenience store. In my view, the majority opinion will preclude many owners from receiving their statutory right to fair market value for involuntarily taken property. Far from "inflating" awards, adhering to the well-settled *Kirkman* rule simply ensures that when citizens find themselves in the path of the latest DOT project, they receive "just compensation" for their lost property— as the United States Constitution and Constitution of North Carolina both require. Put simply, the majority's departure from *Kirkman* withholds essential valuation information from the jury. Because the majority decision impairs the jury's ability to perform its duty of assessing fair market value under N.C.G.S. § 132-112, I respectfully dissent.

Justices WAINWRIGHT and TIMMONS-GOODSON join in this dissenting opinion.