Justice HUDSON concurring in part and dissenting in part.
I agree with the majority that Article 9 and not 11 of N.C.G.S. Chapter 136 governs in this condemnation proceeding. I also agree with the majority's analysis regarding the permits, the lease extensions, and most of its approach to the bonus value method. I disagree with the majority's analysis regarding whether the billboard and the lost income may properly be considered in the valuation of just compensation under Article 9. Accordingly, I would affirm in part, modify and affirm in part, and reverse in part the decision of the Court of Appeals.
**117 Controlling Statutory Scheme
In my view, the Court of Appeals correctly reversed the trial court's decision and concluded that Article 11 does not apply here. As noted below, the trial court's findings and conclusions were based on the erroneous assumption that Article 11 does apply. Specifically, the trial court concluded:
3. N.C. Gen. Stat. § 136-131 specifically addresses the subject matter of the DOT condemning nonconforming outdoor advertising locations. It provides that in any such condemnation, just compensation to the owner of the outdoor advertising shall be measured by the fair market value at the time of the taking of the outdoor advertising owner's interest in the real property on which the outdoor advertising is located and such value shall include the value of the outdoor advertising.
....
*499 5. Because the DOT caused the removal of Adams' nonconforming outdoor advertising property interests at the CHS Lot by way of condemnation, N.C. Gen. Stat. § 136-131 is applicable and controlling in setting the conditions of measuring just compensation.
6. Although the DOT did not file an action specifically for the taking of the Billboard structure , its position that the physical structure of the Billboard and the leasehold interest are separate and distinct interests which should be valued separately is contrary to the plain and specific directives in N.C. Gen. Stat. § 136-131 that just compensation to Adams shall include the value of the outdoor advertising.
The trial court's ruling was based upon a misapprehension of law. Accordingly, I agree with the majority that remand is necessary for a determination of just compensation due to Adams Outdoor under Article 9.
Classification of Billboard
Article 9 sets forth the procedures by which the DOT may condemn property, see N.C.G.S. §§ 136-103 to -121.1 (2015 & Supp. 2016), and provides that when the DOT condemns an entire tract of land, the measure of damages is "the fair market value of the property at the time of **118 taking," id. § 136-112(2) (2015). In determining the fair market value of condemned property, and therefore the compensation to be awarded to the property owner, permanent improvements, such as buildings, "must be taken into account ... in so far as they add to the market value of the land to which they are affixed." Proctor v. State Highway & Pub. Works Comm'n , 230 N.C. 687, 691, 55 S.E.2d 479, 482 (1949) ; id. at 691, 55 S.E.2d at 482 ("Buildings must be regarded as a part of the real estate upon which they stand. Indeed, they are ordinarily without value or utility apart from such realty."). On the other hand, "[n]o allowance can be made for personal property, as distinguished from fixtures, located on the condemned premises." Lyerly v. N.C. State Highway Comm'n , 264 N.C. 649, 650, 142 S.E.2d 658, 658 (1965) (per curiam) (quoting 29 C.J.S. Eminent Domain § 175a(1), at 1045 (1941)), quoted in Midgett v. N.C. State Highway Comm'n , 260 N.C. 241, 249, 132 S.E.2d 599, 607 (1963), overruled on other grounds by Lea Co. v. N.C. Bd. of Transp. , 308 N.C. 603, 304 S.E.2d 164 (1983).
Fixtures, which are objects that are attached to land, are generally treated as permanent improvements and "understood to be a part of the realty." Lee-Moore Oil Co. v. Cleary , 295 N.C. 417, 419, 245 S.E.2d 720, 722 (1978) (quoting Feimster v. Johnson , 64 N.C. 259, 260 (1870) ); see also Fixture , Black's Law Dictionary (10th ed. 2014) (defining a "fixture" as "[p]ersonal property that is attached to land or a building and that is regarded as an irremovable part of the real property, such as a fireplace built into a home"). Whether a fixture is an improvement or remains personal property can depend upon whether it is installed by the property owner or a party owning an interest less than the fee, because when a property owner installs a fixture, "the purpose is to enhance the value of the freehold, and to be permanent," but with a tenant "a different purpose is to be served." Stephens v. Carter , 246 N.C. 318, 321, 98 S.E.2d 311, 313 (1957) (quoting Springs v. Atl. Ref. Co. , 205 N.C. 444, 449, 171 S.E. 635, 637-38 (1933) ). This is particularly true with trade fixtures, which are installed for the purposes of exercising a trade and remain the removable personal property of the tenant. Id. at 320-21, 98 S.E.2d at 312-13 ; see also Wilson v. McLeod Oil Co. , 327 N.C. 491, 515, 398 S.E.2d 586, 598-99 (1990) ("[W]hen additions are made to [the] land by its owner, it is generally viewed that the purpose of the addition is to enhance the value of the land, and the chattel becomes a part of the land. On the other hand, where the improvement is made by one who does not own the fee, such as a tenant, the law is indulgent and, in order to encourage industry, the tenant is permitted 'the greatest latitude' in removing equipment which he has installed upon the [land]." (internal citations omitted) (quoting **119 Little v. Nat'l Serv. Indus. , 79 N.C. App. 688, 692-93, 340 S.E.2d 510, 513 (1986) )). "Whether a thing attached to [the] land be a fixture or chattel personal, depends upon the agreement of the parties, express or implied." Lee-Moore Oil Co. , 295 N.C. at 419, 245 S.E.2d at 722 (quoting Feimster , 64 N.C. at 261 ); see also Stephens , 246 N.C. at 321, 98 S.E.2d at 312 ("The character of the *500 structure, its purpose and the circumstances under which it was erected, the understanding and agreement of the parties at the time the erection was made, must all be considered in determining whether it became a part of the freehold or not." (quoting W. N.C. R.R. v. Deal , 90 N.C. 110, 113-14 (1884) )).
Here the trial court found, inter alia :
32. Because of the permanent nature of the Billboard's construction including being affixed to the land by a concrete foundation 18 feet deep and six feet in diameter, removal and relocation of the entire sign would be impossible.
....
40. As the Lease states, Adams and C.H.S. Corporation intended the Billboard to be permanently affixed to the CHS Lot.
41. The Billboard was a leasehold improvement....
Further, the trial court concluded:
8. The property adversely affected by the DOT's condemnation is Adam's [sic] leasehold interest as improved by the Billboard.
....
11. ... The Billboard could not be relocated intact due to the permanent nature of its construction and because State and local laws prevented such activity....
12. As between the landowner and Adams, the Billboard was the property of Adams and upon expiration of the Lease, Adams retained the discretion to salvage its sign parts. Notwithstanding, the way the Billboard was constructed and affixed to the land made it a leasehold improvement, and for purposes of condemnation, the right of Adams as the tenant to salvage parts cannot be used as a basis for adversely affecting just compensation.
**120 13. As of the Date of Taking, Adams' recorded Lease constituted an interest in real property as improved by a sign.
I agree with the Court of Appeals that the trial court's findings and conclusions-that the billboard was a permanent improvement as opposed to personal property-were not supported by the evidence and were contrary to law.
It is not disputed that the billboard was erected for business purposes and therefore is a trade fixture. Looking to the express agreement of Adams Outdoor and C.H.S. Corporation (CHS), then-owner of the land, the lease provided:
All Structures erected by or for the Lessee ... on the Property shall at all times be and remain the property of the Lessee and may be removed by the Lessee before or within a reasonable time of termination or expiration of this lease, notwithstanding that such Structures are intended by Lessor and Lessee to be permanently affixed to the Property.
It is clear that the intent of the parties was that any structures affixed to the property, including the billboard at issue here, did not become part of the real property, but instead remained the removable personal property of Adams Outdoor. Additionally, as the Court of Appeals noted: Adams Outdoor classified its billboard structures as "Business Personal Property" for tax purposes and paid property taxes in accordance with that classification, and Adams Outdoor's vice president for real estate admitted that the billboard was personal property. DOT v. Adams Outdoor Advert. of Charlotte, Ltd. P'ship , --- N.C. App. ----, ----, 785 S.E.2d 151, 157-58 (2016).
Moreover, in considering the "[t]he character of the structure, its purpose and the circumstances under which it was erected," Stephens , 246 N.C. at 321, 98 S.E.2d at 312, the billboard, unlike a building or other permanent improvements, is not "without value or utility apart from [the] realty," Proctor , 230 N.C. at 691, 55 S.E.2d at 482. As the Court of Appeals pointed out, Adams Outdoor in fact "removed the billboard and structure from the CHS Lot by carefully dismantling them and reinstalling major components thereof at another billboard location along Independence Boulevard, as permitted by the lease agreement." Adams Outdoor , --- N.C. App. at ----, 785 S.E.2d at 157. Nor was the billboard erected to "enhance the value of the freehold, and to be permanent." Stephens , 246 N.C. at 321, 98 S.E.2d at 313. Rather, as the majority notes, "Adams Outdoor's billboard was attached to the land for the purpose **121 of conducting an *501 outdoor advertising business." The billboard was intended to last only until Adams Outdoor decided to remove it, or for as long as the lease itself, which could be terminated at Adams Outdoor's discretion if and when one of the circumstances enumerated in the agreement made the advertising business unprofitable.[1] Accordingly, the billboard was a trade fixture that remained the personal property of Adams Outdoor.
While explicitly agreeing that the billboard was personal property, the majority nevertheless deems it appropriate in determining the value of the leasehold for the trial court to consider the "inherent value of the billboard's presence on the property." But, pursuant to the agreement of the parties, this particular billboard's "presence on the property" was not bound to the lease, as Adams Outdoor specifically contracted for the right to remove it as personal property. See Ingold v. Phoenix Assurance Co. , 230 N.C. 142, 145, 52 S.E.2d 366, 368 (1949) ("[T]he intent of the parties as evidenced by their contract, express or implied, is controlling."). Moreover, as the majority itself then explains, the value of the billboard consists entirely of its potential to produce income, "that is, from the potential to rent it out to advertisers." As discussed more fully below, I do not view this potential as compensable under Article 9, and therefore conclude that this "value" should not be considered in determining the fair market value of Adams Outdoor's leasehold interest. Accordingly, I disagree with the majority and would affirm the Court of Appeals on this issue.
Loss of Income
I also disagree with the majority's Article 9 analysis regarding the consideration of the income from the advertising business located **122 on the billboard. Historically, this Court has not considered business income in determining just compensation in a condemnation action.[2] The majority, citing M.M. Fowler , states that "care must be taken to distinguish between income from the property and income from the business conducted on the property"; however, the majority then proceeds to misapply this very principle. DOT v. M.M. Fowler, Inc. , 361 N.C. 1, 7, 637 S.E.2d 885, 890 (2006) (quoting 4 Julius L. Sackman et al., Nichols on Eminent Domain , *502 § 12B.09, at 12B-56 to -59 (rev. 3d ed. 2006)). In my opinion, the revenue from advertisements placed on the billboard is business income, and is not equivalent to rental income received for the use of the land. In holding to the contrary, the majority relies solely upon M.M. Fowler , but in my view, the majority's conclusion is difficult to square with our Court's decision in M.M. Fowler . As such, I dissent on this issue as well.
Most recently we addressed lost business income in the context of a condemnation action in M.M. Fowler , in which we stated that "[t]he longstanding rule in North Carolina is that evidence of lost business profits is inadmissible in condemnation actions." 361 N.C. at 7, 637 S.E.2d at 891 (citing **123 Pemberton v. City of Greensboro , 208 N.C. 466, 470-72, 181 S.E. 258, 260-61 (1935) ). More specifically, the Court held in M.M. Fowler that:
Admission of evidence that does not help the jury calculate the fair market value of the land or diminution in its value may "confuse the minds of the jury, and should be excluded." In particular, specific evidence of a landowner's noncompensable losses following condemnation is inadmissible.
Injury to a business, including lost profits, is one such noncompensable loss. It is important to note that revenue derived directly from the condemned property itself, such as rental income, is distinct from profits of a business located on the property.... When evidence of income is used to valuate property, "care must be taken to distinguish between income from the property and income from the business conducted on the property."
Id. at 6-7, 637 S.E.2d at 890 (citations omitted). Accordingly, there is a distinction between "revenue derived directly from the condemned property itself, such as rental income,"[3] and revenue from "a business located on the property." Id. at 7, 637 S.E.2d at 890. The latter was at issue in M.M. Fowler when the landowner "attempted to recover for harm to its business rather than damage to the land itself." Id. at 7, 13, 637 S.E.2d at 890, 894.
Regarding lost profits from a business located on the property, the Court held that quantified evidence of lost business profits was inadmissible to determine the fair market value of the land. Id. at 14-15, 637 S.E.2d at 895. In discussing our prior decision in Kirkman v. State Highway Commission , 257 N.C. 428, 126 S.E.2d 107 (1962), the Court opined:
Kirkman clearly does not permit quantified evidence of lost business profits. There is no difference between using lost profits to determine the fair market value of the land and awarding them as a separate item of damages. By either improper calculation, the business receives compensation for its lost profits.
**124 Thus, in Kirkman , we did not approve the use of quantified evidence of lost profits. To the contrary, this Court held unquantified lost business profits are a fact that can be generally considered in determining whether there has been a diminution in value in the land that remains after a partial taking. Our decision in Kirkman must be read with our other cases, which clarify that although the jury may consider adverse effects resulting from condemnation that decrease the value of the remaining property, these effects "are not separate items of damage, recoverable as such, but are relevant only as circumstances tending to show a diminution in the over-all fair market value of the property." Allowing the jury to consider that the land may be less valuable due to the condemnation's effect on the landowner's business does not require quantified evidence of lost profits also be admitted. This is an important distinction which unifies our analysis in both Kirkman and Pemberton . Neither opinion sanctions admission of quantified lost profits evidence.
Id. at 14-15, 637 S.E.2d at 895 (citations omitted). Notably, M.M. Fowler involved a partial condemnation, as opposed to a condemnation *503 of an entire tract; however, it appears that while quantified evidence of lost profits from a business located on a property is inadmissible, unquantified evidence of those profits may be "broadly" or "generally" considered in determining the fair market value. Id. at 14-15, 637 S.E.2d at 895.
Here the revenue received by Adams Outdoor from advertisers to display advertisements on the billboard was not rental income derived directly from the property, but rather business profits from an advertising business located on the property. Adams Outdoor is attempting "to recover for harm to its business rather than damage to the land itself." Id. at 7, 13, 637 S.E.2d at 890, 894. The contracts between Adams Outdoor and its advertisers are not contracts for others to personally occupy and enjoy the real property, but rather for the advertisers to attach their personal property advertisements to Adams Outdoor's personal property, which is attached to the real property for the sole purpose of operating a business. Moreover, unlike the real property that was taken by DOT, this business is not intended to last forever, but only so long as it is profitable. See footnote 1. In my view, the revenue Adams Outdoor received from this business conducted on the property is too attenuated to be considered "revenue derived directly from the condemned property itself." Id. at 7, 637 S.E.2d at 890.
**125 I am unable to conclude, as the majority does, that Adams Outdoor's renting of billboard space is analogous to the renting of residential space in a house or apartment building, or commercial space in an office building. Houses, apartment buildings, and office buildings are permanent improvements and considered part of the real property itself-tenants of those buildings contract for the right to occupy and use some part of that real property. As previously discussed, the billboard here is not part of the real property, but rather is personal property belonging to Adams Outdoor.
Accordingly, the revenue that Adams Outdoor seeks to have considered is lost business profit. Under M.M. Fowler quantified evidence of this revenue may not be considered; however, unquantified evidence of Adams Outdoor's lost business profits may be "broadly" or "generally" considered in determining the fair market value of the leasehold interest. Id. at 14-15, 637 S.E.2d at 895. The Court of Appeals correctly determined that the revenue was lost business profit but did not acknowledge that Adams Outdoor's lost business could be considered more generally as unquantified evidence. Thus, I would modify and affirm the decision of the Court of Appeals on this issue.
The Permits, Lease Extensions, Bonus Value Method
The grandfathered permits allowing Adams Outdoor to operate a billboard (otherwise nonconforming) specifically enabled Adams Outdoor to station its personal property and conduct its business in a manner and location that would not otherwise be legally possible. Accordingly, I agree with the majority that evidence of Adams Outdoor's permits is admissible in determining the fair market value of the leasehold interest. I also agree with the majority's analysis concluding that the automatic ten-year extension of the lease is a proper factor for consideration in determining the fair market value of Adams Outdoor's leasehold, and that the subsequent optional ten-year extensions are too speculative to consider. Additionally, I agree with the majority's analysis regarding the bonus value method; I note only that, because I disagree with the majority's analysis regarding the consideration of the billboard and the advertising revenue, I disagree with which factors would constitute the "appropriate factors."
Conclusion
For the reasons set forth herein, I respectfully concur in part, and dissent in part.
Justices BEASLEY and MORGAN join in this concurring and dissenting opinion.

The lease's cancellation provision reads:
CANCELLATION: If, in Lessee's sole opinion: a) the view of the advertising copy on any Structure becomes obstructed; b) the Property cannot be safely used for the erection, maintenance or operation of any Structure for any reason; c) the value of any Structure is substantially diminished, in the sole judgment of the Lessee, for any reason; d) the Lessee is unable to obtain, maintain or continue in force any necessary permit for the erection, use or maintenance of any Structure as originally erected; or, e) the use of any Structure, as originally erected, is prevented by law or by exercise of any governmental power; then Lessee may, at its option, either: (i) reduce and abate rent in proportion to the impact or loss that such occurrence has upon the value of Lessee's Structure for so long as such occurrence continues; or, (ii) cancel this Lease and receive a refund of any prepaid rent, prorated as of the date of cancellation.

When U.S. Supreme Court Justice Oliver Wendell Holmes served on the Supreme Judicial Court of Massachusetts, he explained, in a passage often quoted by this Court, see Pemberton v. City of Greensboro , 208 N.C. 466, 470, 181 S.E. 258, 260 (1935) ; Williams v. State Highway Commission , 252 N.C. 141, 148, 113 S.E.2d 263, 268 (1960) ; DOT v. M.M. Fowler, Inc. , 361 N.C. 1, 8-9, 637 S.E.2d 885, 891 (2006), that
[i]t generally has been assumed, we think, that injury to a business is not an appropriation of property which must be paid for. There are many serious pecuniary injuries which may be inflicted without compensation. It would be impracticable to forbid all laws which might result in such damage, unless they provided a quid pro quo . No doubt a business may be property in a broad sense of the word, and property of great value. It may be assumed for the purposes of this case that there might be such a taking of it as required compensation. But a business is less tangible in nature and more uncertain in its vicissitudes than the rights which the Constitution undertakes absolutely to protect. It seems to us, in like manner, that the diminution of its value is a vaguer injury than the taking or appropriation with which the Constitution deals. A business might be destroyed by the construction of a more popular street into which travel was diverted, as well as by competition, but there would be as little claim in the one case as in the other. It seems to us that the case stands no differently when the business is destroyed by taking the land on which it was carried on, except so far as it may have enhanced the value of the land.
Pemberton , 208 N.C. at 470, 181 S.E. at 260 (citations omitted) (quoting Sawyer v. Commonwealth , 182 Mass. 245, 247, 65 N.E. 52, 53 (1902) ).

Although the trial court's order refers to "rental income" from the billboard, it appears that the court is actually referring to business revenue received by Adams Outdoor from entities placing ads on the billboard. For condemnation purposes, the only "rental" paid here was by Adams Outdoor to CHS to lease the land on which to place its billboard.